In the matter of the probate of the last will and testament of CATHERINE MORRISEY, deceased.

[Submitted February 17th, 1920.    Decided June 8th, 1920.]

1. Incompetence. Evidence *held* not to establish incompetence, although testatrix was aged and feeble and had at times been *non compos mentis.*

2. Presumption of undue influence. An old lady of eighty, feeble in mind and body, made her will in favor of one in confidential and dominant relations, who had opportunities to exercise undue influence in its procurement—*Held,* "with other slight circumstances," to raise a presumption of undue influence.

3. Overcoming presumption. The presumption may be overcome by the denial of those implicated, but to have that weight the testimony must be impeccable and convincing.

4. Credibility of denial. The denial of the beneficiary is insufficient to overcome the presumption where it appears to be untrustworthy and undependable from other testimony by the beneficiary which is improbable and incredible.

---

On appeal from the Union county orphans court.

*Mr. William S. WolfsKeil* and *Mr. Edward Maxson,* for the proponents.

*Mr. Herbert Clark Gilson* and *Mr. William G. Gebhardt,* for the caveators.

BACKES, VICE-ORDINARY.

This is a will contest. Catherine Morrisey executed her last will and testament in due statutory form February 9th, 1916. She was a widow and childless. Her next of kin were nephews and nieces. She gave her estate to the children of a deceased nephew, Frank and Leonard O'Brien and Anna O'Brien Flemming. The nephews and nieces oppose probate on the ground of incompetence, undue influence and conspiracy.

Mrs. Morrisey was eighty and more when she died in March, 1919. She was of sturdy Irish stock, and in her time was rugged of body and strong of mind, illiterate, but keenly intelligent. Mrs. Morrisey and her husband came to Summit some fifty years ago. He kept a hotel, and she helped, and they accumulated considerable property. He died in the early nineties, and she continued the hotel business, and added to her possessions, leaving an estate valued at $40,000. After his death, the father of the beneficiaries was employed in the management of the hotel, and he and his family made their home with the widow until 1905, when another nephew and his family took their place. This nephew died three years later, and the hotel was given up. His family, known in this litigation as the "Grace Kelleys," stayed on and kept house for Mrs. Morrisey until December, 1915, when they were dispossessed, and Anna O'Brien Flemming, one of the beneficiaries, was installed, with her family. Two months later the will was executed in her and her brothers' favor. Mrs. Morrisey continued with the Flemmings until her death. The change from the Kelleys to the Flemmings came about in this manner: Mrs. Morrisey conceived, and not without cause, that her home had become the rendezvous of undesirables—low and dissolute Polacks, Italians and negroes—that drink was the order of the day, and that she had been robbed; that her home had been debauched and that the surroundings had become repulsive, and that she had, in fact, been robbed of $120 by one of the Kelley boys is believable from Grace Kelley's

31

testimony, and from what she told others. On the witness-stand Grace blasély testified that the whiskey bottle was ever-present and that they all drank freely, including Mrs. Morrisey. In her dilemma Mrs. Morrisey appealed to a Miss Rooney—whose home and mother she had visited daily for years—to get Frank O'Brien to rid her of the Kelleys, and on an afternoon in November, 1915, Frank and Mrs. Flemming spirited the old lady from the Rooney house to the home of their mother. It took a fortnight to eject the Kelleys, and when this was accomplished, Mrs. Morrisey returned to her home in the care of the Flemmings. Mrs. Morrisey had not been apprised of the plan for getting rid of the Kelleys, and was undoubtedly taken by surprise when suddenly removed from the Rooney home; indeed, it is questionable whether, in her precarious condition, she comprehended at all the things that were being done, for it appears that then, and for some time afterwards, her mental faculties were seriously impaired.

1. Counsel characterized the incident of Mrs. Morrisey's removal to the O'Brien home as kidnapping, and as the initial step in a conspiracy to reach the old lady's fortune. The charge of ulterior motive and evil design upon her estate is completely refuted by this single outstanding fact: When Mrs. Morrisey was taken to the O'Brien home, Mary Ann Kelley, of Carbondale, Pennsylvania, the leading spirit of the contestants, and who claims to have been her aunt's favorite niece, was sent for by the O'Briens, and she and her brother responded with their mourning trappings, expecting to attend their aunt's funeral. Mary Ann, being apprised of her aunt's predicament, was asked by the O'Briens to make her home with Mrs. Morrisey and care for her. This she flatly refused to do, saying she cared more "for a little corner in Carbondale than the whole of Summit." Surely, if the O'Briens had schemed to possess themselves of Mrs. Morrisey's property, by gift or will, they would not have put Mary Ann in position to spoil the opportunity at the very inception.

2. In July, 1917, a commission *de lunatico inquirendo* issued out of the court of chancery on the motion of the present contestants, or some of them, and Mrs. Morrisey was found to be of unsound mind as of July 3d, 1916, approximately five months

after she had made her will. The issue of insanity was bitterly contested, and counsel agreed to use at this hearing the testimony there taken.

Mrs. Morrisey was a senile dement at the time of her death; she died of pneumonia. She had been a victim of this disease—mental degeneracy due to old age—for at least ten years. Three months before the will was executed, and shortly after she had been taken to the O'Brien home, Dr. Thomas P. Prout, a specialist in mental diseases, examined her to determine whether she had testamentary capacity, and found her hopelessly incompetent. Later, Mr. McAdams, her attorney, who had meanwhile been pressed by Mrs. Morrisey to draw her will, observed improvement in her condition and asked Dr. Prout to again examine her. The doctor was skeptical, but, demurringly consented, and was amazed at the change. Two or three more visits, and careful tests at each, convinced him that Mrs. Morrisey had revived sufficiently to dispose of her property by will, and so informed Mr. McAdams. On the witness-stand he expressed confidence in his judgments and reiterated his unqualified opinion of Mrs. Morrisey's fitness. On the other hand, the late Dr. Britton D. Evans, of Morris Plains Asylum, who examined Mrs. Morrisey in August, 1917, with a view to testifying in the lunacy proceedings, and found her bereft, there and here stated that she was incompetent when she made her will. Drs. William J. Arlitz and George W. King, gentlemen distinguished in the treatment of mental disorders, basing their opinion upon the facts related by Dr. Evans of his examination, also gave as their judgment that the testatrix lacked testamentary capacity in February, 1916.

The four physicians were of one mind—that the disease had its incipiency at least ten years before the will was made, and that at the time of the lunacy proceedings, in the latter part of 1917, it was terminal in type. And upon this diagnosis Drs. Evans, Arlitz and King expressed the conviction that in view of the inexorable ravages of the disease the restoration of Mrs. Morrisey's faculties, as described by Dr. Prout, was impossible. Dr. Evans went so far as to say that if it occurred it was a miracle. The truth, however, is that there was a recovery, abundantly

sustained by the proofs, and the reason for it, in my opinion, is to be found in things mundane and not in the mysteries of the supernatural.

Up until the day that Mrs. Morrisey was taken from the Rooney home she managed her own affairs, collected her rents and interest on her mortgages, and knew when they were due and from whom; she paid her bills and knew the amounts and to whom due, and was exact in handling money. She was able to attend to her personal wants, at the table, in her toilet, and in the bed chamber. She was religious, said her beads daily, was attended monthly by her father confessor, and received Holy Communion. She knew her friends and enjoyed their society. She was amiable and gracious, and altogether a charming old Irish lady. These traits of character, religious practices and power of self-attention, survived the acute brain-cloud of 1915-1916, and continued until the early summer of 1917, when she began to decline, rapidly at first, then gradually to the end. The witnesses to the execution of the will, Dr. Prout, of whom I have already spoken, and Mr. Corby, a neighbor, who was called in for the purpose, gave satisfying testimony that Mrs. Morrisey understood the nature of the document and its purpose and effect. Dr. Prout at the time made a final test to reassure himself and Mr. McAdams that she was qualified. Mr. McAdams, a reputable member of the bar, who drew the will and supervised the legal formalties of its execution, although satisfied from his own observation and intercourse with Mrs. Morrisey that she was not lacking in testamentary capacity, resisted her importunities to draw the will until fortified by the scientific determination of Dr. Prout that she was fit. His circumspection and precaution were not born of doubt, as insinuated, but were the promptings of a careful lawyer conscientiously serving his client, in whom and in whose estate he had no interest other than as counsel. Such safeguarding inspires confidence, not distrust, in the integrity of wills. Dr. Prout's interest in the case was strictly professional, and it impressed me as profoundly as it did counsel.

On the day of the execution of the will, Mr. Hicks, a notary public, who had a personal acquaintance of many years' standing with Mrs. Morrisey, called to have her verify her signature to a

power of attorney she had executed to Frank O'Brien December 16th, 1915. He found her lucid, entertaining and unchanged.

Dr. Reeder, her family physician, attended her from May, 1916, for two years without perceiving any mental delinquency, unnatural to one of her advanced years, until the beginning of the final collapse in the late spring of 1917. To him she always gave a good account of her ailments, personally paid him for his services, and generally conducted herself becoming one of her great age.

On July 3d, 1916, Mrs. Morrisey drew from the First National Bank of Morristown over $2,000, and Mr. Abell, the assistant cashier, paid over the money unquestioningly, after an intelligent conversation with her in which she gave a reason for the withdrawal. He had no doubt of her lucidity.

Others, whose testimony will not be specially adverted to, bear witness to her recovery.

Now, it seems to me, we find the solution of the phenomenon in this: Mrs. Morrisey had been living in squalid and sordid surroundings, ill-kept, undernourished and over-stimulated. Wholesome quarters, proper care and nourishing food, and liquor eliminated, worked the resuscitation. The three doubting physicians rejected the theory of cause and effect, asserting that the alcoholic taint was negative, or, if of any effect, beneficial to a subject of senility. If they mean that complications, such as alcoholism or devastating fevers, or the like, neither retard nor accelerate the progress of the *disease,* I can readily subscribe to their views; but if their doctrine is that physical impoverishment and protracted alcoholism, plus the disease, will not hasten the dethronement of reason, I must dissent, as being contrary to common experience. It is axiomatic that excessive use of alcohol perverts and deranges the mind, produces stupor and delirium, and that a comparative prenormal state usually follows a period of abstention. Obviously, the effect upon the physically and mentally weak is more precipitate than on the healthy and strong. We have such developments in the present case. I am satisfied that Mrs. Morrisey had sufficient testamentary capacity, and, consequently, the charge of incompetence is not sustained.

3. There is no direct evidence of undue influence. After the Flemmings were installed they took complete charge of Mrs. Morrisey's household, her person, and her property. Blind in one eye and nearly sightless in the other, hard of hearing, and enfeebled by age and sickness, she was unable to give her estate the attention it required, and they managed it for her; and so with the household. Personally, Mrs. Morrisey was ever under the watchful eye and constant supervision of Mrs. Flemming. Comprehensively speaking, the Flemmings were in control; not of their own choosing, perhaps, but because of the exigency; and agreeably so to Mrs. Morrisey, who was happy and contented and appreciative. When the break with the "Grace Kelleys" came, Frank O'Brien took Mrs. Morrisey's securities to his mother's home, and for awhile collected her rents and interest, acting under a power of attorney drawn by Mr. McAdams, whom he had in the meantime retained to advise in the trouble with the Kelleys. Mr. McAdams had been Mrs. Morrisey's counsel in previous years, and it was during his then recent visits to the O'Brien house that she repeatedly asked him to draw her will. It was Mr. Flemming who called in Dr. Prout to make the first examination of Mrs. Morrisey; but whether he did so of his own initiative or at the direction of Mr. McAdams is not clear. Mr. Flemming also selected Mr. Corby as one of the witnesses to the will. Whether the requests of Mrs. Morrisey to Mr. McAdams for a will in favor of the O'Briens were spontaneous or unlawfully procured is conjectural. There was abundance of opportunity and a susceptible and pliant and fruitful subject for exploitation, but that advantage was taken rests in surmise.

Mrs. Morrisey had not been on friendly terms with Mrs. Flemming and her mother for many years—not since the separation in 1915. Leonard and Frank O'Brien visited their grandaunt occasionally, about once a year, and for them she had little concern, it is said. Why this abrupt face-about in sentiment, and the selection of her custodians as the objects of her bounty, to the exclusion of those nearer in kinship, and for whom she had affection? It may have been that the reunion awakened a slumbering love she once bore the O'Brien children when they were members of her household, but this is mere speculation.

Then, again, the nephews and nieces—the contestants—al-

ways had had free access to their aunt, and they were welcome. After the Flemmings became interested, though they were not exactly excluded from intercourse, private interview was not permitted, and, it would appear, Mrs. Flemming was at pains to make their visits uncomfortable and their return unlikely. She also failed to notify them of Mrs. Morrisey's death and burial.

While the history of the case does not warrant a finding of actual imposition, the confidential relation of Mrs. Flemming to the testatrix, and the circumstances that have been related and the culpable incident to be adverted to presently, raise the presumption that undue influence had been exerted by her, which, unless countervailed by satisfactory evidence, controls as a conclusion of fact. *Sparks' Case, 63 N. J. Eq. 242; Cooper's Will, 75 N . J. Eq. 177; affirmed, 76 N. J. Eq. 614.* The presumption may be overcome by the denial of those implicated (*Sparks' Case, supra; In re Anastasia Davis, 73 N. J. Eq. 617; Craft's Estate, 85 N. J. Eq. 125*), but to have that weight the testimony must be impeccable and convincing.

Mrs. Flemming denied the legal imputation, but her testimony does not measure up to the required standard, and for this reason: On February 2d, 1917, Mrs. Morrisey received $2,000 in cash, in payment of a mortgage, and on July 24th, 1917, after the lunacy proceedings were begun, she withdrew $3,000 from a bank. These large sums vanished before the guardian in the proceedings was appointed, November 9th, 1917. Mrs. Flemming professed to be ignorant of what became of the money. She was the old lady's caretaker and knew her every move. Her story that Mrs. Morrisey carried these bundles of bills on her person—the $3,000 when she was admittedly *non compos*—and her intimations that she frittered them away, are improbable and incredible. I believe she knew more than she was willing to tell on the witness-stand, and that she either had the money or knew what became of it. Her disingenuous disavowal of knowledge concerning its disappearance impeached her testimony as a whole and renders her denial of unlawful complicity in the making of the will untrustworthy and undependable. The burden cast upon the proponents of neutralizing the presumption of undue influence by believable evidence has not been met, and probate must therefore be denied.