ESSEX COUNTY ORPHANS COURT.

In the matter of the probate of a paper writing purporting to be the last will and testament of THEODORE GADDIS, deceased.

[Decided April 30th, 1923.]

**Wills—Testamentary Capacity—Undue Influence Considered at Length—Probate Denied.**

On caveat.

*Mr. Abner Kalisch,* for the proponent.

*Messrs. Heine, Bostwick & Bradner* (by *Mr. M. Casewell Heine*), for the caveators.

FLANNAGAN, J.

A paper writing purporting to be the last will and testament of Theodore Gaddis, deceased, was offered to the surrogate of Essex county for probate by Alice Cox, the sole beneficiary thereunder. Caveats having been filed by the next of kin of the deceased, the matter was certified by the surrogate to this court.

Among the grounds of contest urged by caveators is that of undue influence.

The deceased, Theodore Gaddis, was at the time of his death a man about sixty-four years of age. Up to about two and one-half years of his death he had been a prosperous merchant in the city of Newark, keen and alert in business and natty in dress.

About that time, however, when he was some sixty-one to sixty-two years of age, he met with serious business reverses, resulting in his bankruptcy and the loss of all his possessions. The effect of this upon Mr. Gaddis, mentally and physically, was one which is not uncommon in men of that age under such circumstances—with such men the spirit is broken—

they lose all initiative, confidence, ambition and hope—weakness, fear and inertia takes possession of them. To those who knew them in the heyday of prosperity they become pathetic.

Such a man was the deceased from his bankruptcy until the day of his death. His utter transformation as a business man was demonstrated when he started again in his old line of business in association with a former employe. He sat in the office for a large part of the time inert, dejected and complaining and the venture failed.

When Mr. Gaddis' bankruptcy left him practically penniless, his niece, Mrs. Eppele and her husband, took him and his wife to their home and kept them there until the death of Mrs. Gaddis and kept him thereafter until he saw fit to leave under circumstances which will be related later.

Mr. Eppele was a successful and capable business man, the president of a bank and of a large manufacturing industry, and he undertook to, and did, handle Mr. Gaddis' business affairs for him, becoming his business adviser.

During Mr. Gaddis' business career the proponent, Miss Cox, was a privileged employe in his office. After his bankruptcy she set up a claim against him for moneys given him for investment for her account, but diverted to his own use. Mr. Eppele, as the person in charge of Mr. Gaddis' affairs, arranged with Martha .G. Limberger, Mr. Gaddis' aunt (known as Aunt Pet), to pay this claim, but Mr. Gaddis declined to sanction such payment, denying the claim and stating that he had given Miss Cox money for years and her family coal for years and the matter was dropped.

Later on, while Mr. Gaddis and his wife were living with Mrs. Eppele, it was found that Mr. Gaddis was engaged in secret correspondence with Miss Cox, and when his wife had suffered a stroke and lay unconscious in the house he wrote Miss Cox telling her that his wife remained unconscious, and that the conclusion would certainly not be long and telling her that every day he was thinking of her, i. e., of how she would enjoy the beauties of the country where he was. He addressed her as "Dear Mudder," and concluded with "Au revoir, L. & K., Yours Daddy." The context and the cir-

cumstances, especially in the absence of any explanation by Miss Cox, suggest that the letters L. & K. stand for love and kisses.

Some time after his wife's death, Mr. Gaddis left the Eppele's home, and though apparently remaining on affectionate terms with them, took up his residence secretly with Miss Cox, continuing to keep from them the knowledge of his whereabouts until Mr. Eppele discovered it through a common business connection, at whose place of business he was accustomed to meet Mr. Gaddis in connection with the latter's business affairs.

After his wife's death, Mr. Gaddis came into possession of her property and also received a legacy from his said aunt, known as Aunt Pet. This property is the subject of the paper writing offered by Miss Cox for probate.

In December Mr. Gaddis had a conversation with Mr. Eppele on business matters and the matter of a will was discussed. In that conversation Mr. Gaddis said he intended to leave his property to his relatives (excluding certain of them by name), and on another occasion asked Mr. Eppele to take certain investments in his (Mr. Eppele's) name, saying that he (Gaddis) did not want the people in Newark he was staying with (Miss Cox and her family) to know that he had the money.

About a week before his death, and during his last illness, Mr. Gaddis sent for Mr. Eppele, getting not Miss Cox but a sister of hers to write him to come and see him at Miss Cox's house.

During the interview thus brought about between Mr. Eppele and Mr. Gaddis, business matters were discussed and the matter of a will was mentioned, apparently in passing, but no indication of any change of testamentary intention was given. During the talk Miss Cox was discovered by Mr. Eppele eavesdropping at the door.

On the day before the night when Mr. Gaddis died he was visited at his room in the hospital by the witness Buckley. Mr. Buckley was sent by Mr. Eppele to get Mr. Gaddis' endorsement on one check and to leave another check with him.

He found Mr. Gaddis, very nervous, weak and his speech thick—it took about ten minutes to get Mr. Gaddis to understand the object of the witness' visit. It was later, in the same day about five P. M., that the will was executed. Mr. Gaddis expired during the night, February 8th.

The circumstances connected with the execution of the will were these:

The will was drawn and the execution supervised by Mr. Werner, an attorney associated with former Judge Quigley, the latter having been Mr. Gaddis' lawyer in connection with the bankruptcy matters. Mr. Werner received two telephone calls on the day he drew the will, each of them requesting that he come to Mr. Gaddis at the hospital. One of these calls was received during Mr. Werner's absence from his office, but the second one he received in person. The calls were "very urgent," and the second call was in a lady's voice. Mr. Werner testified that he suspected a will was to be drawn and went prepared. He found Mr. Gaddis and Miss Cox in Mr. Gaddis' room alone. She opened the door and admitted him. When Mr. Gaddis said he wanted a will drawn, Mr. Werner asked Miss Cox to leave the room. The drafting of the will took twenty to twenty-five minutes, and when Mr. Werner went out of the door to get a witness, he found Miss Cox standing alongside of the door to the left. He asked Miss Cox to get a nurse for a witness, but she was apparently unsuccessful, for he went himself for one, leaving the will in Mr. Gaddis' room. He returned with the witness, the young man, Cecenia, a visitor at the hospital, whom he found down stairs, and who was a stranger to all concerned. The witness Cecenia testifies that when he arrived in Mr. Gaddis' room Miss Cox was there; that she did not want to go out when asked by Mr. Werner to do so, but after being twice asked by him went out. Mr. Gaddis did not say anything while Cecenia was in the room, and when he left Miss Cox was just outside.

Mr. Werner states that during the time he was there no nurse came in, but there was ministration by Miss Cox; Mr. Gaddis was in pain and she would hold him up and he would

spit in a cup or receptacle, but these ministrations did not occur during the period the will was being prepared.

On the next day and after Mr. Gaddis' death, Mr. and Mrs. Eppele and Miss Cox met at the undertakers. Mr. Eppele asked Miss Cox if she had any knowledge of there being a will, and she said that she did not have any knowledge of a will at all, but had heard Mr. Gaddis say that if anything happened to him that any information in regard to his affairs could be obtained from Judge Quigley. Mr. Eppele thereupon went out and telephoned to Judge Quigley's office and came back and told Miss Cox he had been advised that Mr. Gaddis had made a will the day before in her favor—she made no reply.

On the trial Miss Cox still remained silent, electing to leave all of these things unexplained. The question is, Was the burden cast upon her to explain? The contestants urge that the testimony raises a presumption of undue influence.

While certain guides have been laid down by the courts for the decision of will contests based on undue influence, each case must of necessity turn on its own particular facts and circumstances.

*In re Cooper's Will, 75 N. J. Eq. 177* (at *p. 181*), it is said: "Slight circumstances, in addition to such relation [viz., a confidential relation], will throw upon the beneficiary the burden of showing that the testator's mind was not unduly influenced." See, also, *Wheeler* v. *Whipple, 44 N. J. Eq. 141* (at *p. 145*); *In re Morrisey's Will, 111 Atl. Rep. 26* (at *p. 28*); *Zelozoskei* v. *Mason, 64 N. J. Eq. 327* (at *p. 328*); *Koch. N. J. Pro. Law 163.* Confidential relations and opportunity to exercise the influence they import do not alone raise any inference of undue influence, but there must be in addition other and further circumstances pregnant with inference or suggestion thereof. If the confidential relation exist, do those additional circumstances appear from the evidence in this case?

The evidence shows that the relations between Mr. Gaddis and Miss Cox were carried on under subterfuge and secrecy.

The testator was a married man living with his wife, and Miss Cox, a single woman, knowing him to be so situated.

Some relations had existed prior to his bankruptcy when she was a privileged employe. He wrote her in terms reprehensively affectionate from the shadow of his wife's death bed. He left his own flesh and blood to go and live clandestinely with her. Under these and the other circumstances I find the relation to have been confidential. The opportunity was abundant. It is not necessary that these "slight circumstances" should be in the nature of proof of actual imposition. If they have the appearance of inconsistency with frankness, honesty or fair dealing in procuring the will, they may turn the scale; selecting a witness to the will, barring or making uncomfortable the visits of visiting relatives, selecting the scrivener of the will, possession of the will, presence at its execution, concealing the existence of the will, an abrupt face about in sentiment and the selection by the deceased of his custodians as the objects of his bounty and various other circumstances, have been declared by the courts of this state to be potent.

The language in the *Morrisey Case, supra,* aptly shows that the words "slight circumstances" are not used in any strained sense and do not involve anything more than these words naturally imply. In holding that the burden of explanation was, under the circumstances of that case, cast upon proponent, the learned vice-ordinary says: "There is no direct evidence of undue influence * * *. Whether the request of Mrs. Morrisey (the testatrix) to Mr. McAdams (the scrivener) for a will in favor of the O'Briens were spontaneous or unlawfully procured is conjectural. There was abundance of opportunity and a susceptible and pliant and fruitful subject for exploitation but that advantage was taken rests in surmise." *Morrisey Case, supra.*

The evidence is abundant that the relation between Mr. Gaddis and Miss Cox was confidential, and that he was "a susceptible, pliant and fruitful subject for exploitation," enfeebled in mind and body and that ample opportunity presented.

I will refer to several circumstances which I consider potent ones:

*First.* Within a short time of his death Mr. Gaddis told Mr. Eppele what his testamentary intentions were and they did not include Miss Cox as a beneficiary. At that time he was living with Miss Cox, relations had existed with her for years, all the apparent inducements to prompt him to make a testamentary disposition in her favor existed in full force. It is stated that at the time he executed his will he said that his relatives had plenty of money; that Miss Cox had taken care of him and he wanted her to have what he had. These considerations existed at the time he made the declaration to Mr. Eppele that he wished his property to go to certain of his relatives. The relative prosperity of his relatives and Miss Cox was the same at that time as it was at the time of his death. The inquiry is if these considerations had not been sufficient to inspire a testamentary desire towards Miss Cox up to that time, what influence intervened during the last week, when testator was in the hospital very sick and entirely miserable, to induce him to make a sudden and complete reversal of testamentary intent and give everything to Miss Cox to the entire exclusion of his relatives? So complete a change in so short a time without any material change in the apparent inducing circumstances suggests that some explanation on the part of the proponent should be forthcoming.

*Second.* Miss Cox was possessed of the power to exercise a strong influence over Mr. Gaddis. Although broken in spirit and finance and lacking in initiative or independence and though, living with relatives who had shown him and his wife most admirable kindness, he elected to leave these surroundings with the disguised purpose, which he fulfilled, of taking up a secret abode with Miss Cox.

*Third.* The scrivener, though not positive, states that he thinks Miss Cox was not in the room while the will was being drawn, but his testimony does not convince that his recollection is clear and his statement that no nurse came in at all while he was there and his account of Miss Cox's

ministration make it likely that his recollection is not clear and that her ministration continued during that period. *Stenog. pp. 25, 26.* The fact that the scrivener states that he asked Miss Cox to go and get a witness for the will seems to make her presence more likely. *Stenog. p. 17.* At least these circumstances leave the mind in a state of uncertainty as to her whereabouts at that time. If not actually present during the time the will was being drawn Miss Cox was in close touch and proximity. When the scrivener came by unexplained summons to draw the will he found Miss Cox there and he states that she left the room at his request during the actual preparation of the will but we find according to the witness, Cecenia, she was in the room during the interim when the scrivener after completing the draft went down stairs to find a second testamentary witness. Thus it is shown that while the will was drafted and in final form ready for execution but before it had been executed it remained in the room with Miss Cox and Mr. Gaddis alone. It seems to me that while this may not be in one sense presence during the preparation of the will it is too close to it to remain unexplained.

*Fourth.* Mr. Gaddis made a bill of sale of his household furniture to Miss Cox. This transaction evidences at least a receptive disposition on her part. This disposition was further manifested by the rejected claim she set up against Mr. Gaddis for money claimed to have been entrusted to him by her for investment. On occasion when Mr. Gaddis received certain funds he indicated to Mr. Eppele a desire to place part of this property in Mr. Eppele's name, giving his reason for this desire that Miss Cox or her people might not know that he had the money. These circumstances suggest that even the bill of sale of the furniture may not have been entirely without reluctance and that the receptive attitude of Miss Cox was fully appreciated by Mr. Gaddis. The facts and circumstances are at least all within Miss Cox's knowledge but she does not come forward and explain them.

*Fifth.* I think the evidence raises a strong inference that the will was found in Miss Cox's possession—she was engaged in ministration to deceased at the period the will was drawn. The will was left by the scrivener at the place where she and the testator were left alone together and within a few hours of his death. The next that is seen of the will is when she offers it for probate. While I do not decide that the deceased did or did not possess testamentary capacity, his faculties, mental and physical, were so broken that it is impossible to believe that the will did not come under Miss Cox's control in the light of the disposition shown by her and of the interest manifested by her in a will, both at the time at which the will was executed, when she had to be twice requested to leave the room and at the time she was eavesdropping on the occasion when a will was mentioned in the discussion between testator and Mr. Eppele in Miss Cox's home.

*Sixth.* After Mr. Gaddis' death, Miss Cox definitely concealed the fact that she had any knowledge of his having made a will, falsely stating that she did not know anything about it. The facts of this episode at the undertaker's establishment have already been fully discussed.

*Seventh.* The facts, as far as they are disclosed, in regard to the calling of an attorney to draw the will, leave Miss Cox under a legitimate inference that she was the active instrumentality. The evidence shows that two very urgent calls were made to the scrivener's office and that the second call was in a woman's voice. When the scrivener arrived he found Miss Cox alone with Mr. Gaddis in his room at the hospital.

All of the various circumstances which I have recited, taken all together are sufficient in my opinion to cast upon one in the situation of Miss Cox, the burden of neutralizing by believable evidence the presumption of undue influence which arises from them. She has elected to sit silent without any explanation whatsoever and the probate of the alleged will must therefore be denied.