ESSEX COUNTY ORPHANS COURT.

In the matter of the probate of a paper-writing purporting
to be the last will and testament of JAMES G. BARNETT,
deceased.

[Decided February 19th, 1924.]

Wills—Probate of—Undue Influence Sustained—Lack of Testa-
mentary Capacity Not Sustained—Acts Necessary to Con-
stitute Undue Influence Considered and Applied.

On appeal from probate.

*Messrs. Warren, Britt & Stanton* (by *John Warren*), for
the appellant.

*Mr. Charles C. Pilgrim* and *Mr. Frederic C. Ritger,* for
the respondent.

FLANNAGAN, J.

A paper-writing purporting to be the last will and testa-
ment of James G. Barnett, having been offered for probate
to the surrogate of Essex county by Tillie O. Barnett, was by
him admitted to probate.

The estate of the deceased consists of a large amount of
both real and personal property.

There were no children of deceased, his nearest blood rela-
tive being his nephew, Fred M. Barnett.

The will left the entire estate to said Tillie O. Barnett,
the wife of deceased, to the exclusion of his said nephew,
who now appeals to this court from the surrogate's court,
setting up as grounds of appeal lack of testamentary capacity,
fraud and undue influence.

The deceased was a man sixty odd years of age, of inferior,
undeveloped mentality, bordering on the weak-minded. He
was amiable, trustful, readily influenced by those about him,
of either superior or more determined mentality, and had

been accustomed all of his life to be led and to rely upon others to think and act for him and to be guided by their views. His father was a man of influence and wealth. Every opportunity for advancement which wealth and position offer was open to him, but his character and ability were such that he availed of none of them. He inherited a fortune from his father and his father's brother, and spent his life in luxury, without occupation, ambition or definite object and in a kind of mental stagnation.

Because he was his father's son and inherited his property he took his father's place as a director in the Murphy Varnish Company and as a trustee in the Central Methodist Episcopal Church. At the meetings of those boards he played the part of the "dummy director," never rendering a decision or passing judgment on anything that arose, but assuming an attitude of silent assent.

When he met the proponent he was in frequent contact with his father's former associates, people of character and standing in the community, whose lives were admirable and whose purposes were righteous and commendable. He was religious, charitable, quiet, kind and amiable.

Such was the decedent, James G. Barnett. Such were his associations at the time he met the proponent. He had been previously married. His wife had died, and he was engaged to be married to another lady.

On the other hand, Tillie O. Barnett, the proponent, was a woman designing, worldly wise and of many adventures. Her associates were far removed in character from those of deceased. Divorced by two former husbands, she was no stranger to scandal and notoriety. Her marriage to deceased was her fourth marriage. On the stand she testified she had been married three times, and on being confronted with the facts pretended she had overlooked or forgotten one husband. Though Earle was neither her maiden name (that being Jannich), nor the name of any of her husbands, she testified she could not remember whether she had ever been married under that name. She was careless and frequently

Essex County Orphans Court—In re Barnett.

untruthful under oath, and her testimony impressed me on the whole as of little value.

The respective ages, characters, training and experience of the parties to the transaction in question must necessarily throw light on the one's capacity to exert and the other's capacity to resist undue influence.

In the case at bar the training and experience of proponent shows her to be fully capable and qualified to dominate and control a man of the capacity, training and experience of the deceased. In *Moore* v. *Blauwelt, 15 N. J. Eq. 367,* the ordinary says: "It [undue influence] must necessarily depend, in each case, upon the means of coercion or influence possessed by one party over the other; upon the power, authority or control of the one, the age, the sex, the temper, the mental and physical condition, and the dependence of the other" (*p. 368*).

In the spring of 1919 an acquaintance was "scraped up" between the proponent and deceased on the fishing pier at Belmar, where deceased owned a summer residence. She was not over-delicate about her intentions and was overheard to say to some other women, in answer to their inquiry as to what she was doing there, that she was "hunting for some rich old geaser."

The acquaintance thus initiated was followed up by proponent, by visits by her to Barnett at his residence, where he was living alone with his domestics.

During the period following the meeting on the fishing pier proponent declared, on an occasion in New York, that she was going to marry a rich old man from Jersey and that "sometimes when you are married to an old man they don't live very long and then you can enjoy all their money." At another time she said that if she "got the old boob" one Raymond Miller should have a nice present. After the wedding deceased gave Raymond a watch.

The "courtship" which was going on during these expressions of proponent culminated in the marriage of the parties on March 24th, 1920.

After the marriage was consummated proponent began to weaken and absorb the deceased mentally, and to acquire his property. She obstructed access to him by his former associates; those of his old family servants who were willing to stay she gradually displaced; she stopped his charities and ended the religious contributions, which his father had been accustomed to make before him and which he had inherited as a custom from his father; she assumed to regulate who should talk to him, personally or on the telephone; directed his mail to be delivered to her and took control of his business affairs.

Deceased was, of course, what is called "an easy mark," and because of this fact it may be that he was better off without some of his former friends and associates. He may have suffered petty impositions on the part of his servants, but the new way reflected the mind of Mrs. Barnett, while the old way reflected the mind of Mr. Barnett. Asked by one of his friends why he was not "seen about" and did not "come around," Barnett responded that he was a prisoner and could not be around and do what he had been accustomed to do.

These circumstances and other satisfy me that deceased was subjected almost completely to proponent's control and that he did nothing affirmative of any moment except under her prompting.

Proponent's control, as already stated, extended to the management of his properties and business affairs, such as they were. The relations were confidential. As to his realty, a substantial part of it was procured to be transferred into her name, and such as he did not transfer to her she either sold or was endeavoring to sell and convert into personalty, a form readily acquired by gift and more certain of inheritance by a wife where there are no children.

The testimony shows declarations by the deceased of his intention to make liberal provision for his nephew, Fred M. Barnett, the contestant, and the evidence shows that proponent successfully contrived to prevent contemplated visits by deceased to his nephew at the latter's home in Chatham.

Toward the close of decedent's last illness, while he was in the hospital in New York, expecting to die, and where he did die, proponent telephoned nightly to contestant, telling him not to come to see his uncle, stating either that it was undesirable or that he was not wanted by his uncle.

The will in question was made nearly two years before deceased died. The immediate stimulus which moved the deceased to make the will was a report by proponent to him of a pretended conversation between proponent and deceased's nephew, fabricated by proponent, apparently, out of the whole cloth. In this report to deceased the proponent, simulating a condition of mind of being, as she expressed it, "all worked up," told the deceased that she had just returned from a visit to the nephew's home and that the nephew had asked her whether deceased had made a will, and had threatened to pull deceased's mother's picture off the wall after his death. Upon this report to the simple-minded deceased he said to proponent: "If he ever tries to pull my mother's picture down * * * take the first thing and brain him."

The appointment to draw the will was shortly thereafter made by proponent over the telephone with the scrivener, and proponent accompanied and was present with the deceased on the occasion when he visited the scrivener and executed his will.

The proponent testified that said conversation with the nephew took place on the occasion of a visit by her with her friend, one Mrs. Miers, to the nephew's home in Chatham; but the conversation is denied *in loto* by the nephew and Mrs. Miers is not produced, and I am satisfied, as I have said, that the conversation is a pure fabrication, concocted by proponent for the purpose of deceiving the deceased, and that it did deceive him, and was the immediate procuring, stimulating cause for his making the will, allaying a latent desire to make testamentary provision in the nephew's favor.

It appears that on the day the will was prepared, when the parties were at the lawyer's office, proponent made inquiry of testator as to whether he wanted to leave his nephew

anything. I regard this as mere stage play for the benefit of the scrivener. Proponent's preparation of deceased for the event left no uncertainty in her mind as to what the answer would be, and that it would be a statement that he did not wish to leave him anything.

Before the will was made proponent declared her desire to have it made in her favor.

After the will was made and after the marriage, proponent showed uncertainty and nervousness about both the will and the marriage and concealed the existence of the will. On two occasions, one in 1921 or 1922 and the other in 1923, when the deceased was at the hospital, in his last illness, she voluntarily represented to the deceased's nephew that no will had been made.

As to the marriage, her nervousness and uncertainty went so far that she procured a second marriage ceremony to be performed by the recorder of North Bergen on December 12th, 1922, shortly before deceased's death.

As to the will, her nervousness and uncertainty extended to the point that she attempted to get a second will executed, inducing a mutual friend or acquaintance to suggest to the decedent that he make a will in her favor.

Her nervousness about the validity of the will and the marriage is suggestive of a consciousness of weakness akin to the consciousness of guilt inferrable from the flight of an accused after the commission of a crime.

After the illness of deceased became serious and he had gone to the hospital she took possession of the will, to which she had had access, placed it in the safe in the home and retained it there until after deceased's death, when it was produced and offered for probate by her.

Between the death of deceased and his funeral proponent rented a safe deposit box in New York in the name of herself and daughter and transferred certain property into it.

Some of the testimony for appellant in this case is that of former servants of the deceased's household. Ordinarily, the testimony of servants against their former employers is considered with some reserve. In this case the old employes

doubtless had an easy time under an easy-going, good-natured, simple-minded and idle master. No doubt they were jacked up by the new mistress; but these were old family servants of conservative, respected and God-fearing people. They were not likely to suit a woman of the manners, customs and character of proponent, and they might be expected to feel righteous indignation at having been placed in the position of authority over them which had been held by a woman such as their first mistress, the former Mrs. Barnett, seems to have been. Some hostility is for these reasons to be expected; but after due consideration of these circumstances, and all the circumstances, I feel that their testimony is credible.

The evidence in the case does not, in my opinion, sustain the claim of lack of testamentary capacity. As to undue influence, a different situation is presented. The testator, while he might not have been incapable of making a will, may have been incapable of resisting the desires of proponent.

The boundary of legitimate influence is not a mathematical line. It has not and never can be defined with precision. It must be ascertained, in each particular case, under established rules of law, applied with the leaven of judicial common sense to all the facts, conditions and circumstances disclosed by the evidence.

The latitude allowed a husband or wife to influence the spouse arises out of the marital relation itself, but where the marriage is, as here, a mere incident and instrumentality in an unrighteous scheme whereby proponent designed to enrich herself at the expense of some "rich old geaser" victim, by any means which might come to hand, the usual latitude should not be allowed. That her purpose was not legitimate is evidenced by her own declarations; that her scheme was fraudulent is evidenced by the method of deception by which she carried it out, and by which the decedent was induced to make a will.

A husband and wife has ordinarily a right to counsel and persuade his or her spouse in the best interest and welfare of the family, to appeal to his or her sense of justice and

duty, to urge his or her views as to the proper, expedient or wise disposition to be made of the spouse's property, and also to influence the spouse in his or her favor. But this marital relation never covers the right to substitute one's will for that of the other, through constraint or fear, constant pressure of importunity or overbearing desire for peace or rest, misrepresentation, or any other means. "Fraudulent and malicious means whereby men are secretly induced to make their testatments are no less detestable than open force."

It has been said that in order to shift the burden of proof to a proponent of a will, on an issue of undue influence, there must be some other elements "added to proof that testator's mind was enfeebled so that it was difficult to resist improper influence and the establishment of intimate confidential relationship." It is said that "slight circumstances" are sufficient to be added. Among the elements which may be thus added, which have been mentioned in the authorities, are these: (1) The initiation of proceedings for the preparation of the instrument; (2) participation in such preparation; (3) presence at the execution of the will; (4) efforts to exclude the natural objects of testator's bounty from his society; (5) concealing the making of the will, and (6) taking possession of the will. *Wheeler* v. *Whipple, 44 N. J. Eq. 145; In re Howard, 9 N. J. L. J. 144; Cooper's Will, 75 N. J. Eq. 177; 76 N. J. Eq. 614; Morrisy's Will, 111 Atl. Rep. 26.*

In the case at bar we have the enfeebled mind difficult to resist improper influence of the proponent, the intimate, confidential relationship, and all the other added circumstances numbered above from one to six. With all these, with the marriage a mere instrumentality in a scheme to get the testator's fortune, and with the scheme consummated and the will induced by means of false and fraudulent representation by proponent to the deceased, the undue influence is affirmatively proved. But it is not necessary to rest the decision on this ground. The least that can be said is that a presumption

of undue influence is raised and the burden shifted to proponent.

This presumption, "unless countervailed by satisfactory evidence, controls as a conclusion of fact." It cannot be overcome by proponent's testimony, because her testimony is neither "impeccable" nor "convincing." The testimony of proponent's attorney does not answer. The work of proponent had been done before the testator got to the attorney's office. The scrivener was merely an innocent means used by proponent to put her will, not decedent's, into effect.

The conclusion that false representations about his nephew were made to deceased, inducing him to make a will excluding the nephew, is based upon the testimony of proponent, and it is true that her testimony is frequently false, and, as has been said, on the whole, is neither "impeccable" nor "convincing." The rule *"falsus in uno, falsus in omnibus"* is not a mandatory one, but is rather a permissible inference, and does not require the court to believe all or disbelieve all of a witness's testimony who knowingly testifies falsely upon a material fact. It is for the court to sift the testimony, to seek out and ascertain the truth. The court may accept part of the testimony as true and reject part as false. *State* v. *Dugan, 84 N. J. Law 606; 85 N. J. Law 730; State* v. *Samuels, 104 Atl. Rep. 322; 92 N. J. Law 131.*

For the various reasons stated the appeal is sustained and probate of the alleged will is denied.