Lynch *v.* Clements.

LYNCH *vs.* CLEMENTS and others.

1. The undue influence that is sufficient to invalidate a will, must be such as to overcome the volition and free agency of the testator.

2. The inequality and injustice in the provisions of the will cannot by themselves be adequate to prevent a court of equity from giving aid to carry out its provisions, but they may suffice to call for explanation from those in whose favor they are made.

3. What influence amounts to undue influence, in the sense of the law, cannot be defined or described with exactness, but only in general and approximate terms. Each case must be decided by the application of these general principles, with good sense, to the special facts and surroundings of the case.

4. The bill being filed by a brother against his brother and two sisters to recover the bulk of the father's estate claimed by the former as residuary legatee under the will, *held*, that the facts of the case showed that the will was made by the father at the dictation or under the control of the complainant, and that he was therefore not entitled to relief.

Argued on pleadings and proofs.

*Mr. Evans*, for complainant.

*Mr. Tuttle*, for defendants.

THE VICE-CHANCELLOR.

The object of this suit by James Lynch, is to recover from his brother and two sisters the bulk of his father's estate,

which, as residuary legatee, he claims under the will; and the defence is, that the will was procured by undue influence on his part, and that he is therefore not entitled to any relief.

The testator, Bernard Lynch, was for many years a resident of Paterson, in this state, where he died on the 25th day of November, 1861. His will was signed on the 13th of the previous September, and proved in the surrogate's office of Passaic on the 16th of the following December. At his death, he was seized of a farm in Paterson, of sixty-eight acres, which he had owned and occupied for twenty-one years, and from which, by his labor, he had derived a support. He was advanced in years when he died, and left surviving him his widow, Margaret, and four children, James, Elizabeth, Bernard, and Margaret. Margaret was then sixteen years of age, and Elizabeth considerably older. Both of them had lived at home, working with their parents, and were doing so at their father's death. Bernard, a young man, had enlisted in the war, and James, the oldest of the children, had left home, unwilling to work, when about sixteen years old, and had subsequently, for fifteen years, or thereabouts, led a profligate and disreputable life in the city of New York. He had assumed the name of James Collins, followed no legitimate business, but was a gambler, keeping at one time a gambling-house in Broadway, and at another, a low house and drinking place in Water street. He made occasional visits at his father's, in Paterson, while his father was alive, and his father visited him in New York. He lent his father money, at different times, and at his death, held a mortgage for $3000 on the farm.

The will gave $1000 to Elizabeth, $500 to Margaret, and $1 to Bernard; the residue, both real and personal, to the widow for life, and after her death to James. The widow and James, and one John O. Neill, were the executors, and were empowered, by the widow's consent, to turn the farm into money. It was sold in 1866 for $21,000, out of which the mortgage on it for $3000 was paid, $14,000 of the price secured by a mortgage, and $4000 paid in cash. The widow

then purchased two lots in Paterson, and built on them a house, out of the estate means in her hands, and lived in it with her three children till she died, in March, 1872. Before her death, James had got from her $8000 of the principal, $4000 at one time and $4000 at another, and urged her to let him have more, which she refused. The two sums of $4000 each, he spent in gambling and betting. In July following her death, he filed his bill in this suit to get what was left. The real estate being vested in the widow, individually, descended by law to the four children, as tenants in common, but the three children, defendants, are in possession of it, and whatever of the personalty remains, is also in their hands. The complainant asks that they be decreed to convey to him the real estate, and to account for and pay over the moneys or personal effects derived from the father's estate, which, as representing the mother, or otherwise, they may have.

That the will makes a grossly unequal distribution of the property among the four children, giving most of it to one so unworthy, must cause instant and strong disapproval, but it is hardly needful to say, that the want of wisdom and justice thereby evinced, is not sufficient by itself to make the will invalid, or to prevent this court from giving aid to carry out its directions. The testator had a clear legal right to give all his property to James, to the exclusion of his three other children, entirely, without regard to their respective characters or needs, and against natural affection and duty. The only inquiry in the case is, was the instrument by which his property was so disposed of, his will? Was it the product of his own free and personal volition, or were his free agency and volition in the execution of the instrument, or in respect to any of its directions, overborne by the domination of James? If the former, the complainant is entitled to take the whole of the remaining estate, though only to squander it in folly and vice ; but if the latter, his suit will be denied, not by reason of the contents of the instrument, but on the ground that it was not, in law or in fact, the testator's will.

It is not suggested, that there was any want of testamentary capacity. The evidence is, that the testator had it, and was not so affected by old age or disease—though to some extent affected by both—as to expose his will, on this ground alone, to successful dispute.

It is impossible to define or describe with precision and exactness what undue influence is, what the quality and extent of the power of one mind over another must be to make it undue in the sense of the law, when exerted in the making of a will. Like the question of insanity, it is to some degree open and vague and must be decided by the application of sound principles and good sense to the facts of each given case. In *Trumbull* v. *Gibbons*, 2 *Zab.* 136, it was said by Chief Justice Green: "All influence on the part of the devisee in procuring a devise in his favor is not undue influence. The influence of affection, of kind offices, even of pursuasion, does not invalidate a will; otherwise the very motive to the testator's benevolence would make void the gift. The influence which the law denominates as undue influence over the testator, must be such as to destroy his free agency, and amounts to moral or physical coercion; it must be proved, moreover, that the act done was the result of such coercion; there must be a control exercised over the mind of the testator, or an importunity practised which he could not resist, or to which he yielded for the sake of peace."

The rule was expressed as follows, in *Turner* v. *Cheesman*, 2 *McCarter* 265: "The influence exercised over a testator which the law regards as undue or illegal, must be such as to destroy his free agency, but no matter how little the influence if the free agency is destroyed, it vitiates the act which is the result of it."

In *Jarman on Wills*, 2d *Amer. Ed., Vol.* 1, *p.* 36, it is said: "The influence which would subdue and control a mind naturally weak or one which had become impaired by age, sickness, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired. But in any case the influence that will vitiate

a will, must be such as in some degree to destroy the free agency of the testator and constrain him to do what is against his will, but what he is unable to refuse or too weak to resist."

The general rules applicable to the subject are thus stated in *Redfield on Wills, Vol.* 1, *pp.* 510, 511 : " In regard to undue influence the cases are almost infinite in number and variety. It is not possible to reduce them into any systematic classification. Where the party to be benefited by the will has a controlling agency in procuring its formal execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest explanation. So where a will is unreasonable in its provisions and inconsistent with the duties of the testator, with reference to his property and family, this will of itself impose upon those claiming under the instrument the necessity of giving some reasonable explanation of the unnatural character of the will. While undue influence embraces fraud, fraud by no means embraces every species of undue influence ; since it is quite supposable that one may really exercise a degree of influence over the testator in producing the testamentary act, which upon every just ground is fairly entitled to be considered extreme and unreasonable, either in character or degree, without its being really fraudulent. All such influence is unquestionably, in a general sense, to be regarded as undue; but it must be left to the sound discretion of the triers, whether it really had proceeded to the extent of virtually overcoming free agency, and so reached that point which the law denominates as undue in the sense of avoiding the will."

The foregoing are the principles applicable to the present inquiry, and sufficiently show what I have before said, that the question, what influence is undue, must, from the nature of it, be decided in each case very much on the special facts and surroundings which that case presents.

The conclusion I have reached, after listening to the witnesses in this case, and giving to their testimony the most careful attention I have been able to bestow, is that the com-

plainant exercised an influence in the procurement of the will now in question, which, in the proper legal sense, was undue, and which must prevent him from maintaining this suit. He testified for himself. His two sisters, on the other side, testified against him. Their statements and his, in regard to material points, are in flat contradiction. But they are corroborated and supported by the testimony of their maternal uncle, John W. Collins, a resident of Brooklyn, who was called by the defendants, and whose careful, not to say reluctant statements, and the intelligence and apparent conscientiousness with which they were made, entitled him strongly to credit. The complainant testified that he never but once had a conversation with his father about making a will, and that was nearly a year before he died. He fixes, however, the date of the conversation he refers to by a circumstance which proves that it must have happened but a few weeks prior to his death. He says it occurred in New York, when returning with his father from a visit to his brother Bernard, then with his regiment on an island in the East river, and that it was after the battle of Bull Run. He says that Bernard had had a bad spree, and that his father told him, on returning from the visit, that that fellow should never have a dollar of his money ; that his father then said to him, " how would you draw up a will if you were going to draw one ? "; and that he answered, " if I were you, I would give all to my mother during her life, and after her death to suit himself." He asserts this to have been the only time he talked with his father about making a will. The evidence shows that it was not; and the conversation itself, as he gives it, is quite consistent with the belief that the old man, who is also shown to have been accustomed to visit not unfrequently his son's place in New York, was accustomed also to ask for and defer to his will. His sister Elizabeth testified that the funeral of a deceased sister occurred at her father's house on the 4th of September, 1861 ; that James was present at it, and that he came again nine days afterwards, on the day the will was made, and went out alone with her father, who

afterwards sent for Mr. Tuttle, instructed him how to draw the will, and signed it that evening. The testimony of John W. Collins was, that he attended the funeral on the fourth; that he saw James Lynch there, and heard a conversation that day after the funeral, between James and his father, about a will; that James suggested the amounts which should be left to the children, or some of them; that he suggested $1000 for Elizabeth, and $500 for Margaret, and he thinks also, but is not positive, that James suggested one dollar for Bernard. The latter was not present at the funeral, being absent in the army. Collins further testified that it was said that Elizabeth was getting advanced in years, and that $1000 wouldn't be too little for her; that Margaret was younger, and in all probability would marry; if she got a worthy man $500 would be sufficient, and if he should prove unworthy, $500 would be too much for him. That this was about the substance of what was said. As before remarked, the testimony of Collins was not that of a willing witness against James, but only that which his oath extorted, and I give full credence to his statements. He further testified that the old man went down to New York that night, with James, and staid with him, as he understood; that he parted with them on the corner of Chambers street and West Broadway; that James kept, at that time, a place in Water street for the resort of low characters; that witness never visited the place but once, when he went to see James at his mother's request; that he had heard of his father's going there and staying all night, frequently.

A conversation between Elizabeth and her father, not long before he died, about the contents of the will and the reasons why he gave James so much of his property, was testified to by her, and if admissible as evidence, would exhibit the influences which he said induced him to do so. I am of opinion that these declarations of the testator, shortly after the will was made, cannot be regarded as evidence. They were objected to by the counsel of the complainant and must be

excluded from the case. *Boylan* v. *Meeker*, 4 *Dutcher* 274;
*Redfield on Wills, Vol.* 1, *p.* 553.

Conversations between James and his sisters were also testi-
fied to by the latter, in which he spoke of the agency he had
had in the making of the will ; and if the declarations he is
sworn to have made to them and their mother, after their
father's decease, were in fact made, in form or effect as they
give them, would be decisive and overwhelming against him.
He denied that he made them, but in weighing the evidence,
and testing it by the ordinary rules to which testimony must
be subjected, I cannot believe that their accounts of the
conversations referred to are false in the substance of them,
though their literal accuracy may not unreasonably be ques-
tioned.  They occurred several years ago, and must be taken
with the caution and allowance which the lapse of time
should give rise to.  In respect to the interests they severally
have in the result of the suit, the two sisters are entitled to
credit as much at least as the brother, and upon all other
grounds they must be admitted to be entitled to very much
more.  They testified that in the winter of 1871, when the five
years for which the mortgage for the purchase money of the
farm was given, was about to run out and the principal fall due,
James came over to his mother's, at Paterson, and urged her
to let him have the money, when paid, to invest for her at a
high rate of interest, promising, they think, fifty per cent. ;
that when she refused he swore at her, and said he had done
wrong in having the will made so as to give her the power to
use the money, for she didn't know how to use it.  Both the
sisters testified to the particulars of this conversation, and I
am satisfied that their story is substantially true.  Another
conversation occurred at their mother's house, in 1868 or
1869. . James had come over to get his mother to let him
have money.  Elizabeth remonstrated with him, and told
him it was shameful for him to come up to take money from
their mother, after having deprived her of $4000 ; that she
had barely enough to live on now ; that she didn't blame him
so much as her father, for if her father hadn't made the will

as it was he couldn't come there for money. James said his father had made the will as he told him to make it; he told Elizabeth that if the will had to be made over again, she would get but $100, instead of $1000. Both the sisters give this conversation, at which both were present. They differ in the details, but their stories are not in conflict, and are consistent with the known facts of the case, and by no means improbable in themselves. Two other conversations were sworn to by Elizabeth, as occurring between James and herself, in both of which the same recognition of his control over the making of the will distinctly appeared.

All the facts and circumstances of this case justify and necessitate the inference that in making this will the old man acted under the control and dictation of James. He was afraid of his power, as the holder of the mortgage on his farm. He was enfeebled by age and disease. He knew his son to be a hard and bad man, and made the will as he directed him to make it, in the vain hope, as may well be inferred from the evidence, that he might treat the family with leniency, and possibly take care of the younger brother, whom he directed his father to disinherit. It was asserted on the part of the defendants, that the will was made on the faith of the promise by James that he would abandon his evil life and come back to live upon the farm when the old man should be dead. This assertion is not sustained by the proofs. James swore that his father asked him to come back, but that he told him he would not. The conversation in regard to it occurred, according to his testimony, about three weeks before his father's death. He was lying in his room, and having called James in, asked him if he would not come back when he was dead. He told his father, he says, that he would not live a year on the farm to have it. I think this was the truth. There was no reason why he should say otherwise. He thought his purpose accomplished, and spoke to the old man without fear, sympathy, or affection, giving the answer that was true to his heart. He knew that no conditions were essential to the making of the will, and that no

promises of concession were necessary then. His ascendency over the old man, was the ascendency of a selfish, resolute son over a feeble and timid father. It was an interference with the exercise of free agency on the part of the latter, and so far as the provisions of the will are in favor of the complainant will bar his right to the aid of this court in enforcing them.

I shall advise that the bill of complaint be dismissed with costs.