In the matter of the estate of LILLIAN NORDICA YOUNG, deceased.

[Argued November 27th, 1918.    Decided March 3d, 1919.]

1. A woman competent to make a will has a right to the aid of any person she may think proper to select, when she, desires to put her testamentary wishes in form to have legal efficiency, and if she exercises this right without improper interference or control, though she selects a person she intends to make one of her beneficiaries, that fact, in the absence of evidence showing an abuse of confidence, constitutes no reason why probate should be denied to her will.

2. Where fraud is charged, the court will scan with care the relations of the testator with her beneficiary, prior to and at the time of the execution of the will, for the purpose of seeing whether they. in connection with the provisions of the will, tend to prove or disprove the charge of fraud.

3. No court has power to refuse probate to a will merely because the disposition the testator has made of her property by it appears to the court to be unnatural, unreasonable or unjust. It is as much the duty of the court to uphold the right of the owner of property to dispose of it by will as she pleases, as it is to see that she is not imposed upon in the exercise of that right.

4. Where it appears that the testator, a highly intelligent and educated woman, caused the draft of a will, consisting of but two type written sheets, to be submitted to her for examination several days prior to its execution, and that immediately before its execution, while she was slightly ill but mentally alert. she "read or looked at' it about half a minute," it will be inferred that she at least scanned it sufficiently to truthfully say, as she did say, that she had read it and understood it.

*90 N. J. Eq.* In re Young's Estate.

5. The orphans court will be held to have had jurisdiction to probate a will begun by petition for the probate of an earlier will, it appearing (1) that such petition alleged that a dispute existed as to which of the two documents thereto annexed was the testator's last will; (2) that all parties in interest under both alleged wills were before the court cited to abide the order to be made respecting such "paper or papers;" (3) that before the hearing was concluded, with the consent of the proponent and sole beneficiary of the earlier will, an appropriate petition for the probate of the later will (which contained an express clause of revocation) was ordered filed *nunc pro tunc*, together with appropriate answer thereto, and (4) that the matter then proceeded to a decree, admitting to probate the later will and denying probate to the earlier will, without any objection in the orphans court to the jurisdiction of that court.

On appeal from a decree of the prerogative court advised by Vice-Ordinary Stevenson.

*Mr. Harry Lane* and *Mr. John C. Tomlinson* and *Mr. Alfred C. Coxe, Jr.* (of the New York bar), for the appellant.

*Mr. Edmund W. Leake, Mr. William E. Decker* and *Mr. Robert W. Light* (of the Boston bar), and *Mr. Walter W. Westall* (of the New York bar), for the respondents Robert S. Baldwin, executor, &c., and Annie Baldwin and Ione Walker, legatees.

*Mr. William Hamilton Osborne, Mr. George B. Astley* and *Mr. Albert G. Thorne* (of the New York bar), and *Mr. Paran F. Rice* (of the California bar), for the respondent Imogene Castillo.

The opinion of the court was delivered by

TRENCHARD, J.

This appeal is taken from a decree of the prerogative court affirming a decree of the Monmouth county orphans court dated October 19th, 1916, admitting to probate a document offered as the last will of Lillian Nordica Young dated January 10th, 1914, and denying probate to an earlier will dated July 3d, 1910, revoked by the will of 1914.

We are of the opinion that the decree must be affirmed.

Madam Nordica, the decedent, was a professional singer. She married George W. Young, the appellant, in London, England, in 1909. Thereafter they made their home at Deal, Monmouth county, New Jersey.

In June, 1913, she embarked upon a concert tour "around the world." Whilst on the way from Australia to Japan she became ill and was taken to the Torres Straits Hospital at Thursday Island. There the will of January 10th, 1914, was executed. She remained there until March 28th, 1914. She died at Batavia, Java, on May 10th, 1914.

Madam Nordica left surviving as her only heirs-at-law and next of kin her husband, George W. Young, and her three sisters.

The will of 1910 differed from the will of 1914, mainly in that under the former the testator's husband was the sole beneficiary, whilst in the latter her sisters were the chief beneficiaries.

The will of 1914 bequeathed to Maria Masino, the testator's maid, $5,000; to Ada Baldwin, her companion, $1,000; to E. Romayne Simmons, her accompanist and secretary, $30,000; to George W. Young, her husband, "his legal portion of the stock now in my name of the Securities Company." The residuary estate was devised and bequeathed to her three sisters, Mrs. Imogene Castillo, Mrs. Annie Baldwin and Mrs. Ione Walker.

George W. Young, Robert S. Baldwin (nephew) and E. Romayne Simmons were named as executors.

In explanation of the bequest to her husband the will contained the following statement:

"In this distribution of my property I am not forgetful of my husband, George W. Young, to whom I have advanced over $400,000 in cash, which I estimate as the full or more than full share to which he might be entitled."

The will made provision for the cremation of the body of the decedent, and contained an express clause of revocation.

If, therefore, the will of 1914 was properly probated, the will of 1910 was properly denied probate. We think it was.

*90 N. J. Eq.*          In re Young's Estate.

It is true the attestation clause of the 1914 will is incomplete, but the testimony of the subscribing witnesses shows that it was properly executed as required by law.

The first contention of Mr. Young, the appellant, is that the will was improperly probated because it did not appear that Madam Nordica had read it or was properly informed of its contents before she signed it.

We think that contention is ill-founded.

The attesting witnesses were William Millan Lebryce, government resident at Thursday Island, and Sadie Charlotte Mac-Donald, matron of the hospital on Thursday Island.

Reduced to narrative form the testimony of Miss MacDonald respecting the execution of the will is in part as follows:

"Madam Nordica was an inmate of the hospital suffering, but not seriously, with pleurisy and pneumonia. Several days prior to January 10th (the date of the execution of the will), I heard her ask Mr. Simmons, her manager, whether her will was ready. He kept putting her off, but prior to January 10th he brought Madam a draft of a will. On January 10th, when I first went into Madam's room with Mr. Lebryce, Mr. Simmons was there. Mr. Lebryce said that Mr. Simmons had brought him the will for execution. Mr. Simmons then asked Madam to have his name 'taken out of the will.' Then Mr. Simmons went out. She requested us to witness the will, saying to Mr. Lebryce, 'I sent for you to witness my will.' Mr. Lebryce presented the will to Madam, and asked her if it was-her will, if she read it and if she understood it. She said 'Yes; I have read it and I understand it.' I then placed the will in Madam's lap and she signed it. I took the will, and I said to her 'Is this your will and your wish?' And she said, 'It is my will and my wish.' I then signed my name and occupation and address. Mr. Lebryce signed his name, occupation and address."

Mr. Lebryce, the other attesting witness, in answer to interrogatories, testifies:

"I asked her (Madam Nordica) if she knew the contents of the document and whether it expressed her wishes regarding the distribution of her property. She said it was her will, and that it expressed her wishes regarding the distribution of her property. She made this known to me by words. I do not remember her saying that she had read it, but she satisfied me that she knew what the document contained and she acknowledged it to be her will."

It will be seen that this uncontradicted evidence is most persuasive that Madam Nordica understandingly published and declared that document to be her will.

The appellant seemingly recognizes the force of this, for he insists that it may be "conjectured" that she was mistaken and that when she said she had read it and understood it she referred to the draft of the will which had been presented to her several days before by Mr. Simmons, and which, the appellant argues, may have been very different from the will she executed.

Considered from any and every angle the record satisfactorily shows that this is not so.

In so far as the argument involved the contention that Madam Nordica was fraudulently imposed upon by Mr. Simmons, and thus induced to execute a paper which was not her will, we think it entirely without merit.

It rests upon these circumstances as its only foundation— (1) the fact that the document was drawn, or caused to be drawn, by Mr. Simmons, and (2) the fact that he received thereunder a legacy of $30,000.

That Madam Nordica was entirely competent to make a will seems not to be questioned—indeed, it could not be questioned in view of the evidence.

A woman competent to make a will has a right to the aid of any person she may think proper to select, when she desires to put her testamentary wishes in form to have legal efficiency, and if she exercises this right without improper interference or control, though she selects a person she intends to make one of her beneficiaries, that fact, in the absence of evidence showing an abuse of confidence, constitutes no reason why probate should be denied to her will.

In this case there is no evidence of improper interference or control, no evidence of undue influence, and we do not understand that this is seriously urged.

Of course, where fraud is charged the court should scan with care the relations of the testator with her beneficiary, prior to and at the time of the execution of the will, for the purpose of seeing whether they, in connection with the provisions of the will, tend to prove or disprove the charge of fraud.

We have done so, and find no evidence of fraud or imposition.

It may be well to remark that the appellant is mistaken in assuming that Mr. Simmons took the initiative. It clearly appears, on the contrary, that the initiative was taken by Madam Nordica. In this connection Miss MacDonald testified:

"*Q.* Did you hear any discussion by Madam Nordica prior to January 10th, 1914, about a will?

"*A.* Yes.

"*Q.* With whom?

"*A.* I continually heard Madam Nordica ask several days previous to that if her will was ready.

"*Q.* Of whom did she ask that question?

"*A.* Mr. Simmons.

"*Q.* What did he reply to that?

"*A.* Well, he appeared to me to be putting her off, always. Madam herself thought that he had a superstitious idea that if she made a will it was bad luck."

It clearly appears that a draft of the will was made, or caused to be made, by Mr. Simmons, and was submitted by him to Madam Nordica several days before the execution of the will on January 10th, 1914.

On this topic Miss MacDonald testified on cross-examination:

"*Q.* Now, you had no knowledge as to whether Madam Nordica had ever seen it before or not, had you?

"*A.* Well, I know that she had had her will submitted to her some days before.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"*Q.* Prior to January 10th, 1914, did you see the Madam have a will in her possession?

"*A.* I know that Mr. Simmons brought the Madam the draft of a will."

It satisfactorily appears, also, that the legacy to Mr. Simmons conformed to the wish of Madam Nordica.

The same witness testified:

"*Q.* Now, does that exhaust your recollection as to what occurred?

"*A.* I remember that when I first went into the room with Mr. Lebryce, Mr. Simmons was there, and that Mr. Simmons asked Madam to have his name taken out of the will."

It further appears that immediately thereafter Mr. Simmons left the room, and the will was executed in his absence.

It further appears that after the will was executed it was left with Madam Nordica in her room.

As a makeweight the appellant contends that the will was unnatural and unjust. But we cannot say that it is so. We cannot say that the bequest to the testator's private secretary and accompanist was an unnatural one. He had served her for sixteen years. Neither can we say that the reduction of the legacy to her husband was unjust, in view of her statement in the will that she thought it fair considering the large cash advances she had made to him.

But, however this may be, no court has power to refuse probate to a will merely because the disposition the testator has made of her property by it appears to the court to be unnatural, unreasonable or unjust. It is as much the duty of the court to uphold the right of the owner of property to dispose of it by will as she pleases, as it is to see that she is not imposed upon in the exercise of that right.

As showing that Madam Nordica was not imposed upon, and that she understood the provisions of her will, the following testimony of Miss MacDonald on cross-examination is significant:

"*Q.* And the paper was folded, was it not, when he (Mr. Lebryce) handed it to her. it was folded?

"*A.* When he handed it to her it was open.

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*

"*Q.* He presented it so that she saw the typewritten sheet?

"*A.* Yes.

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*

"*Q.* He asked her if it was her will?

"*A.* Yes.

"*Q.* And she answered——

"*A.* Yes, she had read it and it was her will, and she had read it and understood it.

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*

"*Q.* She examined the paper?

"*A.* Yes; she looked at it.

"*Q.* Did she read it?

"*A.* I can't say she read it through.

"*Q.* What do you mean when you say she read it?

"*A.* She looked at it.

"*Q.* She glanced at it?

"*A.* Yes.

"*Q.* Was any time consumed in the time she glanced at it and the time she answered yes?

"*A.* No, just a short time.

"*Q.* Just a second—just an instant?

"*A.* I couldn't say how long, but a very short time.

"*Q.* What do you mean by a very short time, expressed in minutes or seconds?

"*A.* Well, I should have thought about half a minute."

We have no hesitation in giving full credit and effect to that testimony. It was given by a woman of intelligence and experience, trained to close and accurate observation. She was wholly disinterested, and was uncontradicted. Now, when we consider that the document that Madam Nordica was called upon to examine consisted of but two typewritten sheets; when we consider that, though slightly ill, she was a woman of education and lively intelligence, in full possession of her mental faculties, and intent upon the business in hand; when we consider that the will had been previously submitted to her after having been drawn by her order, we conclude that during the "half a minute" in which she "read or looked at" the will, she at least scanned it sufficiently to truthfully say, as she did say, that she had read it and understood it.

Lastly, the appellant contends that the orphans court had no jurisdiction to admit the will to probate.

We think there is no merit in this contention.

The mere fact that the proceeding was begun by a petition filed by George W. Young, the husband, for the probate of the will of 1910, is immaterial. The petition alleged, among other things, that

"a dispute has arisen respecting the existence of an alleged will of Lillian Nordica Young, purporting to be dated January 10th, 1914, the existence or validity of which is denied by the said George W. Young, a copy of which said alleged instrument is annexed hereto."

The matter being then certified into the orphans court, all beneficiaries, next of kin, and parties in interest, not only under the will of 1910, but under the will of 1914, were cited to appear "in the matter of the application of George W. Young for

an order admitting to probate a *paper or papers* purporting to be the last will and testament of Lillian Nordica Young, deceased, and to abide the judgment and decree of said court in the premises." The beneficiaries under the will of 1914 answered alleging revocation of the will of 1910 by the due execution of the will of 1914, and, subsequently, before the hearing was closed, two of the executors of the will of 1914 presented a petition for the probate thereof, and, with the consent of counsel for Mr. Young, it was ordered filed *nunc pro tunc,* together with the appropriate answer of Mr. Young. The matter thereupon proceeded to a decree without any objection *in that court* to the *jurisdiction* of that court to probate the will of 1914. We conclude, therefore, that there is no merit in this objection made for the first time on appeal.

The decree under review will be affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—13.

*For reversal*—None.