In the matter of the probate of the alleged will of
MARY LOORI, deceased.

[Decided December 2d, 1941.]

*Messrs. Drewen & Nugent (Mr. John Drewen,* of counsel),
proctors for appellants.

*Messrs. Carey & Lane (Mr. Harry Lane,* of counsel),
proctors for the respondents.

FIELDER, VICE-ORDINARY.

This appeal presents a contest over probate of the will of
Mary Loori dated June 9th, 1938, whereby the testatrix gave
her entire estate to her husband Antonio Loori or in the
event he should predecease her, to her two sons Joseph and
Patrick equally, and appointed her husband executor or, in
the event he should predecease her, then her son Joseph to
be executor. Antonio Loori predeceased his wife by a little
less than two months and she died September 12th, 1940,
leaving ten children, all of full age, surviving her. Caveat
against probate was filed by William Loori, a son, and the
contest coming on for hearing before the Hudson Orphans
Court, that court by decree entered April 21st, 1941, denied

probate and awarded counsel fees of $2,250 to the proctors for the caveator and proponents respectively, both allowances to be paid out of the estate of the deceased. The proponents appeal from the whole decree.

I gather from the oral opinion delivered by the Orphans Court judge that he considered the will to be an unnatural one because it provided for but two of the testatrix' children and therefore the two beneficiaries had the burden of showing there was no undue influence exerted on the testatrix; that the court also thought there were some undisclosed facts unknown to him which might affect the will as a valid testamentary disposition and, considering specifically the unnatural nature of the will, the proponents had not satisfied him that the will was not in some manner induced by some one acting on behalf of Joseph or Patrick Loori; hence he refused to grant probate.

That the court believed the will to be an unnatural one is not in itself a valid reason for refusing to admit it to probate, for no matter how unnatural or unjust the provisions of a will may appear to the court to be, if it was executed in compliance with statutory requirements by a person competent to make a will, as his free and uncontrolled act, the court cannot substitute its opinion for the expressed desire of the testator but must uphold the will. *Middleditch* v. *Williams, 45 N. J. Eq. 726; 17 Atl. Rep. 826;* reversed on other grounds, *47 N. J. Eq. 585; 21 Atl. Rep. 290; In re Eatley's Will, 82 N. J. Eq. 591; 89 Atl. Rep. 776; In re Young's Estate, 90 N. J. Eq. 236; 106 Atl. Rep. 425; In re Haness, 98 N. J. Eq. 645; 130 Atl. Rep. 655; In re Halton, 111 N. J. Eq. 143; 161 Atl. Rep. 809.*

The uncontradicted testimony is that the execution of the will was attended with all the statutory formalities and the questions to be determined are whether the testatrix was mentally competent to make a will and if competent, whether she was influenced by any one to dispose of her estate in the manner she did.

Facts which are certain are that at the date of her will the testatrix, who was about sixty-nine years of age, resided in a home in Jersey City owned by her husband, the members

of the household for many years prior to and up to her death being her husband (until his death) and her unmarried sons Joseph, Patrick and Anthony. Her other children, of whom six were married and one unmarried, had homes of their own. She had had several strokes and was an invalid for the last ten years of her life. She was paralyzed from her hips down and had to be assisted in getting from her bed to her chair. She had a paralysis of one side of her face and by reason thereof had difficulty in 1938 in giving expression to her thoughts, which difficulty in speech was of gradual development as a result of strokes suffered prior to that year. She and her husband had made mutual wills in 1903 in which each had named the other as sole beneficiary, no provision having been made for the event of one predeceasing the other.

It is uncontradicted by evidence or circumstance that on June 1st, 1938, Antonio Loori was at the office of his son Joseph, who is a member of the bar of this state, when Julius Kepsel, also a member of our bar and a friend and former associate of Joseph Loori, happened to be present. During the course of conversation Antonio Loori referred to the old wills he and his wife had executed and the difficulty which might attend probating them in case the attesting witnesses were dead was discussed, and thereupon Antonio Loori requested Kepsel to prepare a new will for him following the form of his old will, which Kepsel did at once and then and there Antonio Loori executed the new will, his son and Kepsel acting as witnesses, and the executed will was given to Joseph Loori to place in his safe. After the new will had been executed Antonio Loori requested Kepsel to call on his wife about making her will but gave him no directions as to what a new will should contain. Kepsel called on her the day her will bears date and her will was drawn and executed that day.

Caveat against probate of Antonio Loori's will was filed by his son William but before a hearing was had thereon, Mrs. Loori died and the contest over probate of the two wills was heard together, the result of which was that the Orphans Court admitted the will of Antonio Loori to probate but denied probate to Mary Loori's will. No appeal was taken

from the decree granting probate to the will of Antonio Loori. The contest over the two wills developed a bitter family feud, on one side being arrayed children who received nothing under the wills and on the other the two children named as beneficiaries under Mrs. Loori's will, and between them there was a sharp and irreconcilable disagreement over facts on which probate of Mrs. Loori's will depended. I think that the testimony of the caveator and of three of his brothers and a sister, as well as that of a brother-in-law, was affected very largely by disappointment that the mother's will made provision for but two of her children.

The testimony of the caveator, who is a physician, was to the effect that his mother had a first stroke in 1927 and at least forty thereafter which resulted in paralysis of her legs, mouth and tongue and caused destruction of brain tissue and softening of the brain; that in 1938 she suffered from mental aberration and acted in a childish and hilarious manner, such as laughing and clapping her hands when spoken to; that she mumbled her words and could not make herself understood; that she did not have the mental capacity to transact business or to handle her affairs or to know what property she possessed, and could not understand what was said to her; that about 1935 she charged her son Patrick with stealing her diamond earrings and some money and called him a crook; that in 1931 she said her son Joseph had taken her money; that some years before his father's death, his father had said that Kepsel (who drew the will and was one of the witnesses) had tricked him and that he (his father) could not trust Kepsel.

A composite statement of the testimony of the caveator's relatives is as follows: In 1938 the testatrix' condition was very bad. She was forgetful, would not know where she was, would laugh and clap her hands and had lost control of her organs. She kept telling them to look after her son Anthony, about whom she always asked. She always wore her diamond earrings and they were not missed until six days before her death. In June, 1938, the testatrix visited a daughter who lived at Glen Rock, being brought there by her son Patrick who helped her from his automobile into the daughter's

home where she stayed to supper and did not return home until after dark. She visited the same daughter again in the summer of 1939 and in that same summer also visited another daughter who lived at Long Branch. In June, 1938, the testatrix' mouth was paralyzed and she drooled and dribbled her food. It was difficult to talk with and understand her and many times it would take ten minutes to understand her. It was very hard to understand her but it was possible to get the gist of what she wanted to say. Three friends and neighbors testified but it is impossible to be certain to what period in the life of the testatrix they referred. Their testimony was that they could not carry on a conversation with the testatrix because of the physical impediment which affected her tongue and jaw and because saliva dribbled from her mouth and prevented speech; that she became childish and when asked a question would clap her hands and mumble. However, one of those witnesses testified that the testatrix showed great affection for all her children and said, "I love my children so much that my own husband was jealous of the affection I have for my children."

I gather from the testimony for the caveator that in June, 1938, Mrs. Loori was an invalid but was not so physically helpless that she could not, with aid, move between her bed and her chair. In that month she was able to take automobile rides and to visit at homes of her daughters at Glen Rock and Long Branch. She could understand what was said to her, and although her speech was affected by paralysis of her mouth, tongue and jaw she could make herself understood, possibly at times with difficulty. There was nothing in that testimony which demonstrated that her mental condition in 1938 was bad, but rather to the contrary. A specialist in nervous and mental diseases, called as a witness for the caveator, examined Mrs. Loori about three weeks before her death and found her mental condition then very bad, but he declined to express an opinion whether in June, 1938, she had sufficient mental capacity to make a will.

The testimony of witnesses for the proponents shows that at the date of her will Mrs. Loori's physical and mental condition were far better than the caveator's witnesses would

make it appear and I state a resume of the testimony of Kepsel who drew and witnessed the will and of the other witness to its execution at some length, because of the great weight which must be given to it, and I note that the Orphans Court judge stated in his opinion that he was satisfied Kepsel told the truth in every respect to all questions asked of him.

Julius Kepsel, a member of the bar of this state for twenty years, testified that he was a friend of the Loori family and had at one time occupied space in the same law offices with Joseph Loori and had performed various legal services for Antonio Loori, the testatrix' husband. His story was that about a week after he had drawn Antonio Loori's will, he called one morning at Mrs. Loori's home and was shown to her room where he found her alone sitting in a chair. He asked her if she remembered him and she said she did and he then told her that her husband had sent him to talk with her about making a new will because the witnesses to her old will were probably dead. He asked her if she wanted to make one and upon receiving an affirmative reply he asked her if she knew what a new will was and she said, "When you die then your property goes the way it is in the paper." He asked her what she wanted to do and she said, "Leave everything to Mr. Loori and if he dies then leave it Patsy and to Joe." He asked her what about the other children and she said, "No, that is the way. You do it that way." He then asked her if she was sure about it and she said, "Yes, that is the way." He asked her if she wanted to tell him why and she said, "No that is all right," or, as he said in another point in his testimony, "That is all right, never mind, everything to Joe and Patsy." He asked her whom she wanted to name as executor and when she apparently did not understand him, he repeated the question in another form and she said, "Make my husband and if he dies, make Joe." He asked her if there were any witnesses about and she said, "No, you bring somebody." He went to Joseph Loori's office, which was nearby, and drew the will, Joseph not being there at the time, and he called Dominick Esposito, a friend of the Loori family, on the telephone and requested

him to meet him at Mrs. Loori's home to witness her will. He and Esposito went to Mrs. Loori's room and found her alone. She said, "Hello, Dominick," to Esposito. Kepsel produced the will, read it to her and asked her if that was what she wanted and she said, "Yes." He asked her if she could write and she said, "No, I can't hold a pen." He asked her if she could make her mark and when she said "Yes," he asked her if she was sure she understood what he had read to her and she said "Yes." He asked her if she wanted Esposito and himself to sign as witnesses and she said, "Yes," and proceeded to sign by mark and they witnessed her signature. She then asked Esposito about his wife, who had recently died and about his little boy and wanted to know about the boy and how things were going. Kepsel asked her what to do with the will and she said "Take and give it to Joe to put with the papers." He and Esposito were with her fifteen or twenty minutes and after leaving her, Kepsel took the will to Joseph Loori's office where he found Joseph to whom he gave the will in a sealed envelope and Joseph put it in his safe. He may have told Joseph what the will provided. He further testified that Mrs. Loori had quite a bit of difficulty in expressing herself and that he talked with her an hour or an hour and a half before leaving to draw her will; that she did not speak fluently and it was an effort for her to convey her thoughts through speech and he had to watch her closely but she showed no signs of not understanding him; that her difficulty in conveying her thoughts had no relation to her mental operation but to her physical condition, and he understood her.

The substance of Esposito's testimony was that he had known Mrs. Loori many years and was a friend of the family. About noon of the day the will was executed Kepsel called him on the telephone and requested him to act as a witness to the execution of Mrs. Loori's will and when they entered her room she recognized and spoke to him. Kepsel read the will to her, explained its contents and asked her if she understood it and if that was the way she wanted her will. She nodded her head and said, "Yes." Kepsel told her she was providing for her husband and in case of his death her

property was to go to her two sons and asked her if she wanted to make provision for her other children and she said, "Patsy and Joe." Kepsel asked her if she wanted him and Esposito to witness the will and she nodded her head and said, "Yes," after which she signed by mark. They were with her about fifteen minutes, during which time she told Esposito she was glad to see him and asked about his boy and what school he went to and told Esposito it was too bad about his wife's death and said, "It is too bad she should die so young." She was feeble and had a little difficulty in getting her thoughts together so she could talk but she carried on an intermittent conversation.

The proponents produced as other witnesses to Mrs. Loori's mental condition, a nurse who attended her daily from and after January, 1939 (apparently Mrs. Loori had not required a nurse prior to that time), except for three months during the summer of 1939 when Mrs. Loori was visiting her daughter at Glen Rock. The nurse read to Mrs. Loori from magazines and newspapers and talked with her about a trip Mrs. Loori had taken to Europe several years previously, also about flowers, clothes and radio programs. She testified that Mrs. Loori had difficulty in speaking but she (the nurse) understood what she said and she related in detail several conversations between them and said that Mrs. Loori was perfectly clear in her mind. Another nurse who attended Mrs. Loori from May, 1940, until her death, testified that up to August, 1940, she had had conversations with Mrs. Loori on various subjects and although Mrs. Loori had an impediment in speech, she had little difficulty in understanding her or in making herself understood.

Two members of the bar, both of whom were acquainted with Mrs. Loori and her family, testified to two separate occasions on which they had witnessed her signature to deeds and had taken her acknowledgment, one on January 8th, 1938, and the other on October 3d, 1938. They both said that besides explaining the deeds to her and then taking her acknowledgment, they had conversations with her on other subjects and had no difficulty in making themselves understood or in understanding her. It was stipulated by counsel

for the parties that the records of the Hudson County superintendent of elections show that Mrs. Loori registered as a voter in October, 1934, and voted at elections in 1934, 1936, 1937 and 1939 and that in 1937 and 1939 she voted at both primary and general elections.

I shall not refer to the testimony of Joseph and Patrick Loori that their mother's mental capacity was normal, except to say that they testified that while there was no hesitation in her speech prior to 1938 it might have been difficult for some people to understand her thereafter but that she had no trouble in understanding what was said to her.

It may be conceded that the testatrix was not in good physical condition when she executed her will and that she had become bodily enfeebled through apoplectic strokes and that the paralysis which affected her mouth and tongue caused her to speak hesitantly and with difficulty, so that at times when she conversed with others and even with members of her family, it required patience and persistence to get an understanding of her wishes or desires. It is not unlikely that clapping of hands and what appeared to be childish actions when spoken to, were but nervous reactions to her mechanical difficulty in giving expression to her thoughts and that such difficulty caused her to be sparing in the use of words so that when she could reply to questions by saying "yes" or "no," she did so without attempting the effort to use further words. The presumption of law being in favor of testamentary capacity, the burden of proof was on the caveator to show that Mrs. Loori lacked such capacity. The right of testamentary disposition is guarded most jealously by our courts and their decisions very definitely assert that such right may be exercised by a person of very moderate mental capacity. *In re Triebe, 114 N. J. Eq. 227; 168 Atl. Rep. 404.*

The court below did not find that Mrs. Loori lacked mental capacity to make a will—in fact after seeing the witnesses and hearing them testify, that court stated that it believed there were periods up to the time of her death when she was mentally competent to make a will, and after careful consideration of the testimony of all witnesses I do not find

evidence that at the time Mrs. Loori executed her will she lacked the mental capacity necessary for the proper performance of that act, and I cannot assume that her bodily infirmities caused or were accompanied by such mental deterioration, if any, as to render her incapable of understanding the nature of that act or to appreciate who the members of her family were and which of them she desired to favor above others in making disposition of her estate. Her husband was her first thought and although he, too, was not in good health, he was at the date of her will attending to his business affairs and, considering her physical condition, he might have been expected to outlive the testatrix. She was on friendly terms with all her children, all of whom except Joseph, Patrick and Anthony, had homes of their own and had lived away from the parental roof for years, while Joseph, Patrick and Anthony were unmarried and from their birth had resided with their mother continuously. She saw Joseph and Patrick daily and the evidence shows that they were the children who devoted more time, care and attention to her wants than did Anthony, who in her later years had merely slept at home and taken his meals elsewhere. I cannot substitute my opinion for that of the testatrix and say that in the disposition of her estate there could not have been perfectly natural reasons for her desire to prefer Joseph and Patrick in what may then have seemed to her to be the remote contingency that her husband would predecease her.

In considering the question of undue influence it may be conceded that a relation of trust and confidence existed between the testatrix and her sons Joseph and Patrick; that residing in the same house with her and seeing her daily, they were in a position to influence her as to the terms of her will, but those facts standing alone are insufficient to raise a presumption of undue influence. There is no evidence that either of them endeavored to induce their mother to make a will, or initiated the steps leading up to its execution, or participated in its preparation, or were present when the will was executed, or that they had made any attempt to prejudice their mother against her other children. The burden of proof to show undue influence was on the caveator

in the first instance and until some fact or circumstance was shown from which it could be inferred that the mind of the testatrix was dominated by Joseph or Patrick, or by some one acting in their behalf, the burden of proof to show that there was no imposition on the mind of the testatrix was not shifted to Joseph or Patrick. *In re Tenenbaum, 118 N. J. Eq. 405; 179 Atl. Rep. 273; affirmed, 119 N. J. Eq. 488; 182 Atl. Rep. 632,* and cases cited. It is my opinion that no such fact or circumstance was shown, but even if the burden of proof was on Joseph or Patrick to show that they had not influenced or attempted to influence their mother's mind in the making of her will, they sustained such burden.

At one time Kepsel had been associated with Joseph Loori for several years, in that they had occupied the same suite of law offices, but six years prior to the execution of the will Kepsel had moved to another community. Notwithstanding that he and Joseph were friends, Kepsel appears to have been a disinterested scrivener of the will, chosen by Antonio Loori by chance to call on his wife for the purpose. I do not believe the testimony on behalf of the caveator that Antonio Loori and his wife were not then on speaking terms —on the contrary I believe the testimony of disinterested witnesses that they conversed and took meals together and there is the fact that he had made his will in her favor. At that time Antonio Loori was the dominant member of his household and it is quite conceivable that after he had executed his own will, he told his wife that Kepsel was to call on her about the preparation of her will and therefore, so far as the testimony discloses, she showed no surprise at his call but was evidently expecting him. Kepsel testified that he had made no appointment to call on her at any definite time and that neither Joseph nor Patrick knew what day he intended to see her. Between the day he had been instructed to call on her and the day he called, he had had no conversation with Joseph or Patrick and neither of them had made any suggestion to him as to what their mother's will should contain. He had not been told by Antonio Loori what testimentary disposition he wanted his wife to make and when he saw Mrs. Loori alone and talked with her for an hour or

an hour and a half, he did not suggest to her how she should make her will but took instructions from her after he had asked her what she wanted to do. Between the time he left her to draw her will and the time she executed it, he did not see Joseph or Patrick but after the will was executed he gave it to Joseph and told him what it contained. The testimony of Joseph and Patrick that they had never exerted or asked any one to exert influence on their mother concerning the disposition of her property; that they had no conversation with her about making or having made a will and that they had nothing whatever to do with its preparation, stands uncontradicted and Patrick testified he did not know until after her death that she had made a will.

The appeal is also from the allowances made by the Orphans Court decree for counsel fees to the respective parties. The statute (*R. S. 3:2-51; N. J. S. A. 3:2-51*) provides that in causes respecting the probate of a will, if probate be refused the court may order the costs and expenses of the litigation paid either by the proponent or out of the estate of the decedent. I assume that proctor for the proponents made application to the Orphans Court for an allowance. Notwithstanding that he there represented unsuccessful parties on whom the court might have imposed the costs of the litigation, his application was granted presumably because the court was of the opinion that the proponents had a right to a full hearing on a will which on its face appeared to have been executed in due form and also because the testimony of the witnesses to its execution disclosed that it had been executed according to statutory requirements. Having granted counsel fee to the unsuccessful proponents, an allowance would naturally be made to the caveator, especially since the court was of the opinion that probate should not be granted. The court had knowledge of the conduct of the hearing and of course knew that a trial which extended over six days required some preliminary work on the part of proctors for the proponents and caveator, and the court also knew from the testimony before it that an estate of approximately $50,000 was involved and on those facts based the allowances. I think allowances were properly made to both proctors and although

I consider those made were most liberal, I am not willing to say that they were so extravagantly liberal that they should be set aside or reduced.

The decree of the Orphans Court will be reversed in so far as it denies probate to Mrs. Loori's will and the record will be remitted to that court with directions to admit the will to probate and to issue letters testamentary thereon to the surviving executor therein named.