Caroline Neuman, nee Karoline Pobarsky, was born in Bohemia. In 1900 she and her two sisters, Mary and Antonette, entered this country and by their exertions they treasured up sufficient funds to enable their parents and other members of the family to rejoin them. A sister Pauline was then the "smallest." Caroline subsequently married one Louis (Alois) Neuman. The marriage evidently was not a ceremonial toy but a union full of constancy, of trust and of mutual advantage. During the past twenty years they had been engaged in the bakery business in North Plainfield. He did the baking and she the vending. The bank account was in his name but she usually supervised the disbursements. *Page 8 
They acquired three parcels of real estate which they preferred to possess as tenants by the entirety.
On April 3d 1941, Caroline Neuman was beset by a serious illness and transported to St. Peter's Hospital at New Brunswick. On April 5th, 1941, she submitted to an operation. On April 11th, 1941, she executed with the requisite formalities her first and only will, in which she devised and bequeathed all her estate to her sister Pauline Sachs to hold in trust for her mother, during the mother's natural life, with remainder to her nephew Allen Otto Sachs, the seventeen-year-old son of Pauline Sachs. Mrs. Sachs was also named executrix. Mrs. Neuman was discharged from the hospital on April 28th, 1941, and died on June 14th, 1941. Her mother, her husband, three sisters and two brothers survived her. Her purported will was probated by the surrogate of Somerset County on June 25th, 1941, at the behest of Mrs. Sachs. The order of the surrogate was nullified by a decree of the Orphans Court on September 26th, 1941, by which it was determined that the will of the decedent was the accomplishment of undue influence practiced upon the decedent by Mrs. Sachs. The propriety of this latter decree is the controversial subject of this appeal.
Falsehood, when exposed, often opens a path to the discovery of the truth. In the present case, the activities of Mrs. Sachs affiliated with the testamentary disposition of the decedent's estate well may have been esteemed as essentially altruistic, had her explanations of her conduct been plausible and credible. The judge whose decree is here impugned, privileged also to observe her demeanor as a witness, expressly resolved that the diversity and contradictions in her testimony were intended to be crafty and deceptive and he appraised her testimony as unworthy of belief. For similar reasons, little, if any, confidence was reposed in the testimony of Dr. Sachs and the son Allen. However, the prosecution of this appeal has necessitated an independent and unconstrained review of all of the evidence. Rusling v.Rusling, 36 N.J. Eq. 603 (at p. 605).
A concise narrative of the facts deemed established by the evidence will suffice. Mrs. Sachs resided in New York City. *Page 9 
Her sister Mrs. Neuman, the decedent, lived in North Plainfield. They had not visited each other frequently for several years preceding the last illness of Mrs. Neuman, although Mrs. Sachs asserts that her relations with her sister were very confidential. Upon the admission of Mrs. Neuman to the hospital at New Brunswick, Mrs. Sachs at some inconvenience began to visit her with unusual frequency. Mrs. Sachs sought and obtained exemption from the rules of the hospital restricting the privileges of visitors and on the occasion of each visit, she availed herself of the opportunity to remain with Mrs. Neuman during most of the day. A sister, Antonette Hobacker, who resided at Bound Brook, occasionally visited Mrs. Neuman and on one or more occasions, Mrs. Sachs, while at the hospital, communicated with Mrs. Hobacker, informing Mrs. Hobacker that it would be unnecessary for the latter to visit the hospital on that day. Mrs. Hobacker expressed her intention to send some flowers, whereupon Mrs. Sachs assured her that Mrs. Neuman did not wish them. Mrs. Hobacker punctually discovered flowers in the hospital room which had been presented to Mrs. Neuman by Mr. and Mrs. Sachs and their son Allen.
Mrs. Sachs relates that on the morning of April 11th, 1941, her sister Mrs. Neuman unexpectedly expressed the desire to make a will immediately and that Mrs. Neuman directed her to promptly summon Mr. Randolph, an attorney practicing at Plainfield, to legally consummate such purpose. Mrs. Sachs insists that she endeavored to transmit this message to Mr. Randolph and learned that he was absent from the city. It is evident, however, that on the morning of April 11th, Mrs. Sachs called at the office of Mrs. Manry, the assistant superintendent of the hospital, and asked her if she would "draw a will." Mrs. Manry expressed her disinclination and advised Mrs. Sachs to procure the services of an attorney. Mrs. Manry recommended, among other attorneys, Mr. William D. Danberry, who was then requested to confer with Mrs. Neuman at the hospital and prepare her will. Mr. Danberry prepared the will, supervised its execution and retained the will at his office until it was presented for probate. Needless to state, there is no implication in this case of any impropriety in the conduct of Mr. Danberry. *Page 10 
Some highly significant inferences seem to exude from certain circumstances accompanying and immediately succeeding the execution of the will. Preceding the actual preparation of the will, Mr. Danberry ascertained from Mrs. Neuman that the value of her personal property was about $400, and that her estate in the realty was that of a tenant by the entirety, and he informed her that by reason of the nature of her interest in the real estate she could not devise it to her mother for life with remainder to her nephew. He explained to her the necessary transformation of her estate which could be accomplished by deeds and which would then enable her to make a testamentary disposition of her one-half interest in the realty. The will was nevertheless prepared as directed by Mrs. Neuman and executed. Manifestly, the decedent's mother and the son of Mrs. Sachs would succeed to a rather miniature estate under the will unless by some means the will should ultimately bestow upon them an interest in the three properties.
Mrs. Sachs was not present when the will was discussed, prepared and executed. She explains that she was then away for lunch. She returned, however, and sojourned with Mrs. Neuman during the afternoon. Mrs. Sachs acknowledges that Mrs. Neuman then informed her that "she had seen Mr. Danberry and that everything was taken care of," but Mrs. Sachs insists that Mrs. Neuman did not acquaint her with any of the provisions of the will or inform her of the inability to devise the interest in the real estate. At 7:55 o'clock on the following morning, Mrs. Sachs despatched from New York a lengthy telegram to Asa Randolph, the attorney previously mentioned, purporting to be signed by "Mrs. Caroline Neuman." This telegram consists of 222 words and was addressed to both the office and the residence of Mr. Randolph. Its manifest object was to have Mr. Randolph obtain the deeds from Mr. Neuman and prepare appropriate conveyances which would vest in Mrs. Neuman an equal and undivided one-half interest in the three parcels of real estate. The telegram emits a tone of extreme emergency. It alludes to Mrs. Neuman's confidence in Mr. Randolph, the addressee, exhorting him to "do all in your [his] power to fulfill my wish." It *Page 11 
fables the period of her (Mrs. Neuman's) married life, her arduous employment in the bakery and its duration, the financial inability her brothers and sisters to maintain their mother and her immediate concern for her mother's future welfare. It is undoubtedly the insidious composition of Mrs. Sachs. On the afternoon of April 11th, Mrs. Neuman probably did little more than express her assent to a change in the title to the real estate and accepted the assurance of Mrs. Sachs that the latter would request Mr. Randolph to prepare the appropriate instruments. Upon reflection, Mrs. Sachs perceived the imprudence of having the instructions to Mr. Randolph come from her, hence the telegram in the name of Mrs. Neuman.
In view of her pretended ignorance of the state of the title, Mrs. Sachs, in acknowledging the communication to Mr. Randolph, explained that Mrs. Neuman composed the telegram and that she, Mrs. Sachs, wrote it on a sheet of paper which happened to be at hand. Mrs. Sachs denies that she comprehended the significance of the message. Although Mrs. Sachs produced a portion of a kitchen calendar on which she had definitely noted the date of each of her visits to the hospital and thereafter to the home of Mrs. Neuman, she did not preserve the paper on which she had inscribed the telegram. Her husband, Dr. Sachs, testified that his wife handed the paper to him to read on the evening of April 11th but that it did not concern him and he examined it only "casually" because as he remarked, "You see, I leave to her things that pertain to the household, household finances and to me, trivial things." Incidentally, Dr. Sachs, emphasizing the demands of his practice as a dentist, nevertheless found opportunities to visit Mrs. Neuman at the hospital on three occasions, and he also produced at the trial a book in which he had recorded the date of each of his visits. This was not the book in which he regularly entered his professional engagements and when and why a special minute of each such visit was made remains in doubt.
Mrs. Neuman returned to her home from the hospital on April 28th, 1941. Mrs. Sachs continued to frequently visit her. Sometime between April 28th, 1941, and April 30th, *Page 12 
1941, Mrs. Neuman addressed an undated letter to Mrs. Sachs which contains this indicative sentence, "Randolph did not come so I think he will come on Monday, and if not, then I will telephone him." Mr. Randolph interviewed Mrs. Neuman on April 30th, 1941, relative to the desired change in the title to the real estate.
Upon her return to her home from the hospital, Mrs. Neuman inaugurated her efforts to persuade her husband to co-operate in the innovation of the title to the properties. Mr. Neuman testified that Mrs. Sachs counseled him "to sign the papers and it will be all right." The requisite deeds were executed on May 16th, 1941, and Mrs. Neuman acquired the title of a tenant in common with her husband to the three parcels of real estate.
Mrs. Sachs first deposed that in none of her conversations with Mrs. Neuman between May 16th and June 14th, did Mrs. Neuman inform her that the deeds had been executed. When later interrogated upon this subject, she stated that on her next visit after May 16th, she learned that the deeds had been signed.
Some significance must also be accorded the fact that neither his wife nor Mrs. Sachs ever imparted to Mr. Neuman knowledge of the execution of the will. Although at the time of the execution of the deeds Mr. Randolph suggested in the presence of Mr. Neuman the prudence of making a will, Mrs. Neuman concealed the event. Upon the death of Mrs. Neuman, Mrs. Sachs engaged the undertaker and assumed charge of the funeral arrangements. She promptly removed some of the decedent's personal effects to her own home. She proclaims, however, that she did not know that she had been named as executrix and that her son was the principal beneficiary in the will until the will was presented for probate.
An effort on the part of Mrs. Sachs to misrepresent the intervals at which Mrs. Neuman visited her is noticeable. Mrs. Sachs alleged that Mrs. Neuman customarily visited her about once a month. Her son acknowledged that Mrs. Neuman had not visited their house for more than a year preceding her last illness. *Page 13 
The solicitude of Mrs. Neuman, the decedent, for the future maintenance of her mother, who was then eighty-two years of age, was natural. Mrs. Neuman also regarded her nieces who resided in Bound Brook most affectionately, one of whom assisted her daily in the bakery for a period of more than four years. She was aware of the modest financial circumstances of her brothers and sisters. She seldom saw Allen. Her apparent indifference toward the situation of her husband and the needs of some of her brothers and sisters and the ultimate donation of her entire estate to the son of Mrs. Sachs seems arbitrary and unnatural in the light of the existing circumstances. Moreover, Mr. Neuman with whom she had united in the acquisition of her estate, was then sixty-five years of age. One of the properties was that in which the bakery was being conducted; another was the home in which Mr. and Mrs. Neuman lived. Incidentally, Mrs. Sachs, as executrix, was clothed by the will with a power to sell the decedent's interest in the real estate.
True, a will cannot be rendered ineffectual merely because it appears to be inofficious, unjust or unnatural. Middleditch v.Williams, 45 N.J. Eq. 726; 17 Atl. Rep. 826; In re Halton,111 N.J. Eq. 143, 150; 161 Atl. Rep. 809; In re Young, 90 N.J. Eq. 236; 106 Atl. Rep. 425. Yet this circumstance may contribute to the necessity for explanation. Lynch v. Clements, 24 N.J. Eq. 431.
Active participation in arranging for the preparation of the will, confidential relationship, interest and opportunity to exert influence, efforts to exclude others from the society of the testatrix, the unnatural character of the testamentary disposition and the concealment of the execution of the will are all pertinent factors to be considered together with the other surrounding circumstances in undertaking to determine whether influence was in fact practiced upon a testatrix and in such degree as to destroy her free agency and to produce a testamentary disposition which she would not otherwise have made. Combinations of such indicia of undue influence may impose a burden on those who offer the will for probate to refute the implications. The testimony of Mrs. Sachs was not convincing. Inre Morrisey's Will, 91 N.J. Eq. 480; *Page 14 111 Atl. Rep. 26. Indeed, the very falsity of her testimony is indicative of her guilt and confirms the inferences which tentatively arose from the circumstances. Thomas v. Thomas,104 N.J. Eq. 607, 608; 146 Atl. Rep. 431.
Each case must be judged by its own surroundings. I have undertaken nothing more here than to merely sketch the prominent features of the evidence. My examination, however, of all of the evidence in the present case convinces me that the conclusion of the judge of the Orphans Court is adequately supported by the inferences logically arising from the established facts and that the decedent's will was the product of undue influence.
 The Ordinary will be advised to affirm the decree under review. *Page 15